On December 13, 2016, a judge of the Probate and Family Court denied a petition filed by the mother pursuant to G. L. c. 190B, § 5-212, to remove the paternal grandmother as the guardian of the mother's son, Jayce. On appeal, the mother contends that (1) the judge improperly shifted the burden of proof from the guardian to the mother to prove her current fitness; and (2) the guardian did not prove by clear and convincing evidence that the mother is currently unfit to have custody of Jayce. Because we conclude that the judge may have improperly shifted the burden of proof on the removal petition to the mother, a fundamental issue that we cannot definitively ascertain based on the record before us, we vacate the judgment and remand the matter for further proceedings consistent with this memorandum and order.
1. Background. We summarize the relevant facts and procedural history from the judge's findings, supplemented by additional undisputed facts from the record. The mother gave birth to Jayce in March of 2006. Shortly thereafter, her relationship with Jayce's father ended due to domestic violence, and the mother moved numerous times over the next five years before returning to the home where she had been raised. The father has not been involved in Jayce's life in any appreciable manner, and he was incarcerated during the pendency of these guardianship proceedings.[3]
Jayce is a severely disabled child who suffers from congenital blindness, hypotonia,[4] and global developmental delays. Shortly after his birth, the mother enrolled Jayce in early intervention services, but they were later discontinued because of "excessive absences."[5] Records from the office of Jayce's pediatrician indicated that the mother canceled multiple appointments for her son between June of 2006 and July of 2009. Similarly, although Jayce received special education services from the Schwartz Center for Children from April of 2009 until August of 2011, the mother was unable to ensure that Jayce arrived on time, if at all, for his program, which negatively affected his progress and ability to transition to a school environment.
The mother, an unemployed college graduate who has been married five times and has three adult children, has a history of involvement with the Department of Children and Families (DCF). The mother has been diagnosed with attention deficit hyperactivity disorder, which causes her to have problems with concentration, organization, impulsiveness, and the completion of tasks.
On June 10, 2011, the mother was arrested and charged with drug trafficking following the execution of a search warrant at her residence.[6] At the time of the arrest, Jayce was at school, and then he stayed with his paternal grandmother until the mother was arraigned. In 2007, the paternal grandmother had retired to help care for Jayce on a full-time basis. Jayce periodically stayed overnight with the paternal grandmother, she cared for him when the mother went away on vacation and on evenings when the mother worked, and she took him to Florida each year for approximately one month. In addition, the paternal grandmother was extensively involved with Jayce's medical care, and she played an integral role in the development of his special education plan.
On June 15, 2011, due to the mother's arrest and the father's incarceration, the paternal grandmother filed a petition in the Probate and Family Court to be appointed Jayce's temporary guardian. The petition was granted and later extended. Around the same time, DCF supported another report of neglect against the mother based on her arrest. On July 27, 2011, while out on bail, the mother was arrested again and charged with possession with intent to distribute a class B controlled substance. She was detained for sixty days, but she did not see Jayce until November, at which point the mother agreed to the appointment of the paternal grandmother as permanent guardian of Jayce.
A judge issued a decree and order on November 14, 2011, appointing the paternal grandmother as Jayce's permanent guardian, and granting the mother supervised weekly parenting time and daily telephone contact. Because the mother consented to the petition, no finding was made that she was unfit. For two years, the maternal grandmother supervised the mother's parenting time with Jayce at the guardian's home. On many occasions, the mother was either late for her visits or she failed to appear, and the mother was confrontational with and verbally abusive to the guardian.
On August 1, 2013, the mother filed a petition for removal of the guardian pursuant to G. L. c. 190B, § 5-212, on the ground that the mother was not unfit to care for Jayce. The judge appointed a guardian ad litem (GAL) to evaluate the mother's fitness and the continuing need for a guardianship. The parties then stipulated that the guardian would keep the mother informed of all educational meetings, extracurricular activities, and medical appointments for Jayce, which the mother was entitled to attend. The mother's motion for expanded visitation with Jayce was denied pending the report of the GAL. On June 12, 2014, the GAL filed her report in which she concluded that the mother was unfit to regain custody of Jayce, and that the guardianship should continue.
The mother's relationship with the guardian continued to deteriorate. When the maternal grandmother eventually refused to supervise the mother's visits with Jayce because of her inappropriate behavior, parenting time was moved to a visitation center. Although the mother frequently arrived late, she was prepared for the visits, she displayed appropriate behavior when interacting with Jayce, and he reacted positively to her presence. At the same time, the mother was heard making critical comments about the guardian who, in turn, was heard making disparaging remarks about the mother. In August of 2014, the mother stopped her parenting time with Jayce, and, apart from a few occasions, she did not have any regular contact with him for nearly two years.
Beginning in 2015, the mother filed three complaints with DCF, alleging that the guardian was neglecting Jayce. Investigators with DCF determined that the allegations were unsupported and that the guardian was providing excellent care for Jayce. During the course of the investigation, Jayce's elementary school teacher reported that the mother had attended only one meeting about Jayce's individualized education plan, and that she had been so disruptive that security almost needed to intervene.
In January of 2016, the mother was hospitalized for several days following an overdose of Advil. She attributed the overdose to a breakdown she experienced after reviewing Jayce's medical records, which indicated that he was experiencing "significant distress."[7]
A five-day trial was held on the mother's petition for removal of the guardian between May and August, 2016.[8] The mother, the guardian, and Jayce were each represented by counsel. Testimony was given by the mother, her fiancé, the guardian, the GAL, and a visitation center supervisor. On December 13, 2016, the judge denied the mother's removal petition.[9] The judge concluded that the guardian had proved by clear and convincing evidence that the mother is currently unfit to parent Jayce, a particularly vulnerable child, and that termination of the guardianship would not be in his best interest. The judge acknowledged that the mother poses no physical threat to Jayce and that she clearly loves him. Nonetheless, the judge stated that the mother, who had experienced significant instability in her own life, had demonstrated an inability to meet the extensive medical and educational needs of Jayce, had gone for lengthy periods of time without seeing him, and had created conflict with those individuals who were caring for and providing services to Jayce. The judge also stated that the mother had not shown any understanding of Jayce's bond with the guardian and essentially sought to all but sever it. For these reasons, and the fact that the paternal grandmother had provided a stable and structured environment for Jayce over many years, the judge concluded that continuation of the guardianship was appropriate. The present appeal ensued.
2. Discussion. The mother contends that although the judge correctly recognized that the guardian had the burden of proving by clear and convincing evidence that the mother was currently unfit to have custody of Jayce, the judge nonetheless shifted the burden of proof onto the mother. In support of her argument, the mother relies on two aspects of the judge's decision concerning the mother's fitness. First, the judge stated that "[t]here was no expert testimony offered by [the m]other as to the potential impact on the child of a change in custody to [the m]other." Second, the judge stated that the mother's "ability to be consistent and to follow through has never been demonstrated by [the m]other in any meaningful way." In the mother's view, the judge based her decision to deny the removal petition on the mother's failure to establish her own fitness to have custody of Jayce. The mother argues that, given this improper burden shifting, the judgment must be reversed.
As a preliminary matter, counsel for Jayce asserts that because the mother did not raise her improper burden-shifting argument below, the issue has been waived. We disagree. Generally speaking, we decline to address issues on appeal that were not properly raised in the trial court. See Adoption of Leland, 65 Mass. App. Ct. 580, 588 (2006). Here, the mother had no reason to raise her burden-shifting argument in the Probate and Family Court because the judge articulated the correct burden of proof on a petition for removal of a guardian. It was not until the judge released her decision that the issue arose, prompting the mother to challenge the purported error on appeal. The mother was not required to first file a motion for a new trial as counsel for Jayce seems to suggest. See In-Towne Restaurant Corp. v. Aetna Cas. & Sur. Co., 9 Mass. App. Ct. 534, 545 (1980) ("A motion for a new trial is not to be used as a 'supplement to appellate opportunities' to raise issues which could have been but were not raised at the original trial" [citation omitted] ).
Turning to the mother's argument, on a petition for removal of a guardian, it is the burden of the guardian to prove by clear and convincing evidence that the petitioning parent is unfit, and that the guardianship should continue in the best interest of the child. See Guardianship of Kelvin, 94 Mass. App. Ct. 448, 453-454 (2018). Because here the mother consented to the guardian's appointment, she does not have the burden of producing some credible evidence of a change in circumstances such that the child may no longer be in need of a guardian. Cf. ibr.US_Case_Law.Schema.Case_Body:v1">id. Rather, the burden is on the guardian to prove, by clear and convincing evidence, that the mother is unfit and, therefore, the guardianship should remain in place. Id. See Custody of a Minor, 389 Mass. 755, 765 (1983) (unfitness must be shown by clear and convincing evidence to justify removal of child from parent's custody); Kauch, petitioners, 358 Mass. 327, 330 (1970) (parent is not to be deprived of custody of child absent finding of unfitness); Guardianship of Estelle, 70 Mass. App. Ct. 575, 578 (2007) ; Adoption of Lorna, 46 Mass. App. Ct. 134, 139 (1999) (burden to prove current fitness in proceeding to terminate parental rights is "never" on parent).
Parental unfitness "means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's [guardian]" (citation omitted). Care & Protection of Yetta, 84 Mass. App. Ct. 691, 695 (2014). It means "grievous shortcomings or handicaps" that put the child's welfare "much at hazard." Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975). See Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998) (judge must determine whether parent would place child at "serious risk of peril from abuse, neglect, or other" harmful activity). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). It is well established that the specialized needs of a particular child coupled with parental deficiencies may clearly establish parental unfitness. See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 389 Mass. 793, 799-800 (1983) ; Care & Protection of Thomasina, 75 Mass. App. Ct. 563, 576 (2009).
As relevant to these proceedings, the bond between a child and a guardian, while not dispositive, is a factor to be weighed in determining whether to return custody to the biological parent. See Guardianship of Estelle, 70 Mass. App. Ct. at 581-582. A judge must consider, among other factors, the effect of a transfer of custody on the child's welfare, and the parent's capacity to handle any trauma that may accompany the child's separation from the guardian. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 582. Expert testimony may be necessary, but it is not required in all cases. See Adoption of Daniel, 58 Mass. App. Ct. 195, 203 (2003).
In her decision, the judge here correctly stated that the burden of proof was on the guardian to establish, by clear and convincing evidence, that the mother was currently unfit. Based on our thorough review of the record, however, we are unable to ascertain whether the judge, in fact, applied the correct burden of proof. First, the judge stated that the mother did not offer expert testimony regarding the potential impact on Jayce of returning custody to the mother.[10] Fairly read, this statement can be construed two ways, one of which would constitute an improper shifting of the burden of proof to the mother. On the one hand, the statement suggests that the judge's dismissal of the mother's removal petition was based, in part, on the mother's failure to prove that a change in custody would not be harmful to Jayce's best interest, even though the burden of proof was squarely on the guardian. On the other hand, the judge's statement could be taken as a comment on the mother's response to the guardian's evidence which, although not directly addressing how a change in custody would affect Jayce, sought to portray the mother as unfit and therefore not entitled to regain custody of Jayce.[11]
Second, the judge stated that the mother's "ability to be consistent and to follow through has never been demonstrated by [the m]other in any meaningful way." This statement also can be construed two ways, one of which would constitute an improper shifting of the burden of proof to the mother. On the one hand, the statement suggests that the judge's dismissal of the mother's removal petition was based on the mother's failure to prove her own current fitness to have custody of Jayce, when, as previously stated, it is the guardian's burden to prove unfitness. See Care & Protection of Ian, 46 Mass. App. Ct. 615, 616, 619 (1999) (impermissible burden shifting where judge stated that mother had not shown that she possessed present ability, capacity, or readiness to parent children). On the other hand, the judge's statement could be interpreted as a comment on the mother's failure to rebut evidence presented by the guardian regarding the mother's current unfitness. See Adoption of Terrence, 57 Mass. App. Ct. 832, 836 (2003) (judge's statements that mother had "demonstrated" little change in her situation and had not "demonstrated" that she was capable of caring for child did not indicate that judge had improperly shifted burden of proof to mother).
Given these different, but equally plausible, interpretations of the judge's reasoning, we cannot say with confidence whether or not the judge erroneously shifted the burden of proof to the mother. It follows that we are unable to determine whether the judge properly concluded that the guardian had proved, by clear and convincing evidence, that the mother is currently unfit to parent Jayce.[12] Consequently, a remand for further proceedings is necessary.
We note that much of the evidence presented by the guardian during the trial on the mother's removal petition was focused on the mother's significant parental deficiencies prior to the time that the paternal grandmother became Jayce's permanent guardian in November of 2011. We recognize that a parent's past behavior can have predictive value, particularly where there has been little evidence of improvement, but the standard by which the parent is evaluated is current unfitness, which cannot be predicated on stale information. See Bezio v. Patenaude, 381 Mass. at 577 ; Adoption of George, 27 Mass. App. Ct. 265, 268 (1989) ; Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 126 (1984).
The judgment is vacated, and the matter is remanded for further proceedings consistent with this memorandum and order.
So ordered.
Vacated and remanded

Although Jayce's father is not a party to these proceedings, he communicated with the guardian ad litem assigned to this case, and he did not object to the paternal grandmother's appointment as Jayce's guardian.

Hypotonia is a medical condition characterized by poor muscle tone (commonly known as floppy baby syndrome). See Stedman's Medical Dictionary 939 (28th ed. 2006).

It appears from the documents in the record appendix that the mother discontinued these early intervention services because she was moving out of the service area.

According to the mother, this criminal charge was dismissed in March of 2012.

In her findings, the judge stated that the "[m]other offered no evidence from any medical professional regarding her diagnosis or treatment subsequent to her breakdown."

At the time of trial, the mother was living with her fiancé and serving a one-year term of probation for the July 27, 2011, drug charge. After the trial's second day, the judge entered an order allowing the mother to visit with Jayce at the guardian's home.

The judge also established the parameters for weekly parenting time and daily telephone contact between the mother and Jayce; directed the guardian to notify the mother about Jayce's medical appointments, educational meetings, and extracurricular activities; prohibited each party from making negative or derogatory comments about the other in front of Jayce; and prohibited the guardian from making any such comments about the mother to medical or school personnel.

It appears that the judge was referring to testimony from medical professionals whom the mother had consulted about formulating a custody transition plan for Jayce.

In her decision, the judge stated that "[r]emoval from the [g]uardian's care would likely cause psychological harm to the minor child and the risk of exposing the child to this harm is heightened by the fact that this child suffers from a severe disability and developmental delays." We are unable to determine the factual basis for such a conclusion. Jayce's pediatrician did not testify at trial, and the documents that have been included in the record appendix do not set forth this opinion.

Our ability to review the judge's decision has been hampered by the fact that many of the documents and records on which the judge relied have not been included in the record appendix.