Following a lengthy trial, in December, 2014, a Juvenile Court judge concluded that the parents were unfit to parent Major and Amy (collectively, children), and that termination of parental rights was in the children's best interests. In this consolidated appeal, the parents claim the judge erred in terminating their parental rights, and in denying their motions for relief from judgment.[3] We affirm.
Background. The judge made 184 findings of fact and twenty-nine conclusions of law, which "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence."[4] Adoption of Don, 435 Mass. 158, 165 (2001). We summarize those findings.
Together, the father and mother are the biological parents of Beth (a pseudonym), born in January, 2003; Major, born in February, 2006; Amy, born in July, 2008; and Susan (a pseudonym), born in January, 2014. Susan has lived with the parents in New Hampshire since birth and is not involved in these proceedings. Prior to trial, the parents stipulated to termination of their parental rights to their oldest child, Beth. The trial was limited to the parents' fitness to parent Major and Amy.
In July, 2011, two reports were filed pursuant to G. L. c. 119, § 51A (51A reports), alleging a wide range of parental abuse and neglect, and physical and verbal abuse of the children. Although the parents denied hitting the children or each other, the judge did not credit their denials. An investigation by the Department of Children and Families (DCF) substantiated the allegations and led to an extensive service plan.
In January, 2012, DCF received another 51A report. A DCF investigation confirmed that the father had broken Beth's nose by punching her in the face. The mother tried to cover the resulting bruise with makeup, and both parents told Beth to lie to her teachers about the injury. When school personnel questioned the mother, she told them Beth had fallen and hurt herself. She did, however, admit that the father had "smacked" Beth in the mouth recently, and that she would "smack or backhand" Major and Amy when she could not control them, although she claimed not to "hit them hard enough to cause a bruise."
The father was charged with assault and battery on a child, and both the mother and father were charged with reckless endangerment of a child. DCF removed the children and placed them in foster care on January 19, 2012. DCF filed a petition to terminate the parents' rights the next day.
There were three important developments between the filing of the petition and the trial. First, despite participating in therapy, both Major and Amy developed more challenging special needs. In his foster home, Major used inappropriate language, threw tantrums, intentionally banged his head against objects, and abused the foster family's dog. He was disruptive and aggressive at school. A school psychologist suspected that Major suffered from ADHD and PTSD. Amy was diagnosed with adjustment disorder and had "problems of conduct," including aggressive behavior.
Second, the parents participated in ongoing services and visitation with the children. With some exceptions, the parents completed their individual service plan tasks. The father participated in anger-management therapy and completed a batterer's intervention program. Both parents participated in parenting classes. The judge noted, however, a therapist's concern that the father was only "saying the right things" during sessions, and that the mother's participation in therapy was sporadic.
Unsupervised visits were terminated due to the parents' failure to comply with DCF safety guidelines. The ensuing supervised visits were problematic. The parents were often unable to control the children's behavior. On several occasions, the parents walked away from difficult situations, leaving DCF personnel to address the children's behavior problems.
Third, there was evidence that Major was sexually assaulting Amy. Amy alleged Major had touched her vagina and "hurt her feelings" while at their parents' home for a December, 2012, weekend visit, and also complained of pain in her genital area after returning from her parents' home after a New Year's Eve, 2012, visit. Amy was evaluated and trauma therapy was recommended for her and Major. Later that year, the foster family found Major on top of Amy, forcefully holding her down while trying to kiss her. Amy "seemed shaken" and the children were placed in separate bedrooms. Amy was observed to have scratches, bruises, and redness around her vagina.
Discussion. 1. Termination of parental rights. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). Such a finding must be supported "by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). The judge must "analyze the parent's character, temperament, capacity and conduct in relation to the particular child's needs, age, affections and environment." Adoption of Carlos, 413 Mass. 339, 348 (1992). "We give substantial deference to a judge's decision ... and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra. For the reasons that follow, we discern no abuse of discretion in the judge's conclusion that there was clear and convincing evidence of parental unfitness.
Here, there was evidence of a history of domestic violence and child abuse. Such long-standing patterns of physical abuse weigh heavily in considering both the fitness of the parents and the children's best interests. See Custody of Vaughn, 422 Mass. 590, 595 (1996) ; Adoption of Ilona, supra at 62. In addition, the judge's assessment of parental fitness appropriately considered the children's significant special needs. See Adoption of Jacques, supra at 607-608. It is undisputed that both Major and Amy were, at the time of trial, dealing with serious behavioral and emotional problems. The parents consistently demonstrated an inability to address those special needs. During unsupervised visits, the parents left the children without adult supervision for significant periods, in which time Major may have victimized Amy. During supervised visits, the parents were unable to manage the children's behavior, often responding in ways that compounded the problem or put the children at risk.
"Although the record indicates that the [parents] ha[ve] considerable love for [their] children and [the children] for [the parents], it also demonstrates a lack of [understanding or insight] on [the parents'] part." Care & Protection of Three Minors, 392 Mass. 704, 712 (1984). For example, there was evidence that the parents played age-inappropriate video games with the children, causing Major to have nightmares, and that the domestic violence between the parents continued in front of the children.
We are not persuaded by the parents' argument that the evidence of unfitness was stale at the time of trial. The judge was "permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the [children]." Adoption of Ilona, 459 Mass. at 60, quoting from Custody of Two Minors, 396 Mass. 610, 621 (1986). The judge acted within his broad discretion in concluding that "[i]n large part, the issues that existed [at the start of DCF involvement in 2005] persist to this day."
While we commend the parents' effort to comply with the majority of DCF's service plan, "[t]he judge was not obliged to believe that the parenting skills of the mother or the father had improved simply because of their recent cooperation with [DCF], or that their good intentions eliminated risk of future abuse" or neglect. Adoption of Lorna, 46 Mass. App. Ct. 134, 143 (1999). Considered in its entirety, the record supports the judge's conclusion that the parents were unfit to care for the children, despite incremental improvement after the petition was filed.[5]
Further, under these circumstances, the judge acted within his discretion when he concluded that "[i]t [was] in the best interests of [Major] and [Amy] to end all legal relations between them and Parents. [The children] need and deserve permanency, safety, and security, which neither parent can provide." While we appreciate the parents' concern and affection for their children, on the record before us we discern no abuse of discretion or clear error of law in the termination of parental rights.
2. Motions for relief from judgment. The parents contend that their progress in the three years after the entry of the decrees demonstrates that any unfitness was temporary, and that their motions for relief from judgment should have been allowed.[6] We review a motion for relief from judgment in Juvenile Court by looking to Mass.R.Civ.P. 60(b), 365 Mass. 828-829 (1974). See Adoption of Rory, 80 Mass. App. Ct. 454, 455 n.3 (2011). A judge may grant such a motion for "newly discovered evidence" or "any other reason justifying relief." Mass.R.Civ.P. 60(b)(2) and (6). We review the denial of a motion for relief from judgment for abuse of discretion. Adoption of Rory, supra at 457.
Posttrial affidavits from the parents indicate they have maintained steady housing and employment, and have successfully parented their youngest daughter. They claim that there is no longer violence in the home. In 2016, a promising preadoptive placement for the children fell through when the children engaged in inappropriate sexual behavior with one another. The children were separated as a result. The parents claim these two changed conditions-sustained improvement in the home, and increased uncertainty in the children's placement-were extraordinary circumstances justifying reconsideration of the termination decrees. The judge was not required to credit these self-serving affidavits regarding improvements in the parents' home in New Hampshire, particularly when there was no new evidence regarding the parents' ability to care for and manage their children's special needs, including the inappropriate sexual behavior that caused their separation. Simply put, we cannot conclude that the judge abused his discretion in concluding that "[t]he rights of the Children would be adversely affected by allowing the Motion."[7]
Decrees affirmed.
Orders denying motions for relief from judgment affirmed.

The father filed the first motion for relief from judgment in December, 2014, shortly after the judge's original termination order. He and the mother jointly filed two others in December, 2015, and January, 2017.

The written findings were issued sixteen months after the entry of the decrees. While this delay is unfortunate, there is no indication that it prejudiced the parents, or that it impacted "the accuracy of the judge's memory in making those findings." Adoption of Rhona, 57 Mass. App. Ct. 479, 488 (2003).

The parents assert that the judge failed to consider (1) the opinion of their parenting expert that the parents were qualified to parent the children, and (2) their success in parenting their youngest child who continued to reside with them. Although it may have been a better practice to make findings regarding that evidence, see Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption, 376 Mass. 252, 260 (1978) ("[t]roublesome facts, pointing to a conclusion contrary to that reached by the ... judge, are to be faced rather than ignored"), the judge was under no obligation to do so where the great weight of the evidence supported the finding of unfitness.

We address only the parents' third motion for relief from judgment, as it renewed arguments in the first two motions which the parents claimed strengthened over time.

"Other points, relied on by the [parents] but not discussed in this opinion, have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).